1
2
3
4
5
6
7
8
9
10
11
12
13

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| United States of America, | ) | |
|---|---|---|
|     Plaintiff, | ) | CR 05-01794-TUC-RCC (JCG) |
| | ) | **REPORT &** |
| vs. | ) | **RECOMMENDATION** |
| | ) | |
| Richard Peter Adams, | ) | |
|     Defendant. | ) | |

14      Pending before the Court is Defendant's Motion to Suppress filed on February 8,

15  2006.  (Doc. No. 37).  The United States filed a response on March 20, 2006 (Doc. No. 44)

16  and the Defendant replied.  (Doc. No. 48).

17      This matter was set for evidentiary hearing and evidence was heard on September 12,

18  2006.  Defendant Adams, who remains in custody at this time, was present and represented

19  by counsel.  This matter was submitted following oral argument at the conclusion of the

20  hearing and taken under advisement.

21      Having now considered the matter, the Magistrate Judge recommends that the District

22  Court, after its independent review, deny Defendant Adams' Motion to Suppress.

23                          **FACTUAL FINDINGS**

24      On July 28, 2005, a DEA task force, relying on information provided by an informant

25  ("Informant 1"), served a search warrant on the residence of Robert Piehl in Arivaca,

26  Arizona.  As a result of the search, the task force seized 6700 pounds of marijuana and 1

27  kilogram of methamphetamine, along with several weapons.  While at the location, agents

28  noticed other items that could have been seized, but because of the danger presented by

1   methamphetamine manufacturing equipment on site, the agents decided to return the

2   following week with another search warrant.

3          DEA Special Agent Derek Brown was part of a separate task force investigating

4   Defendant Adams. Adams resides on a 7-acre parcel located just north of the Piehl residence

5   with his girlfriend, Roberta Elliot.[1]   Unaware of the information provided to the first task

6   force by Informant 1, Brown obtained a tip from another informant ("Informant 2") regarding

7   a shed located on Adams' property.  Informant 2 reported that the shed covered an

8   underground bunker where large quantities of marijuana were stored.  Informant 2 identified

9   Adams' property after viewing aerial photographs provided by agents.  Upon discovering that

10  a task force would be executing a second search warrant for Piehl's residence, and that Piehl

11  was Adams' neighbor, Agent Brown decided to participate in the search of Piehl's residence

12  in hopes of investigating the tip regarding the shed and possibly making contact with Adams.

13         A second search warrant was obtained for the Piehl property, and at approximately

14  7:00 p.m., on August 4, 2005, a DEA task force, including Agent Brown, traveled to the

15  Piehl property in order to execute the second warrant at the Piehl residence.  The Piehl

16  residence is accessed only by a dirt road common easement, which crosses along the eastern

17  edge of Adams' property.  Agents traveled south along the easement and parked their vehicles

18  along the eastern edge of Adams' property, just north of the entrance to Piehl's property.

19  Agent Brown testified that his vehicle was parked near the end of the row of agent vehicles.

20  The agents intended to use the easement on Adams' property as a staging area for service and

21  execution of the Piehl warrant.

22         The portion of the easement on which the agents parked was east of and adjacent to

23  a large dirt parking area on Adams' property.  A blue and white recreational vehicle (RV)

24  was parked in this area, approximately 100 feet west of the agents' vehicles.  While agents

25  were preparing to execute the warrant on Piehl's property, the door to the RV opened and a

26  man peeked out and then quickly closed the door.  Agent Brown testified that he and several

27  _____

28         [1] Adams and Elliott are month-to-month tenants on the property.

- 2 -

1    other agents approached the RV in order to make contact with its occupant.  The agents were

2    concerned about security in the area because drugs and weapons had been confiscated from

3    the Piehl residence, the area was known to be occupied by alien and drug smugglers, and the

4    agents had limited communication with their Tucson office from this remote location.

5        Robert Johnson stepped out of the RV and approached the agents at their request.

6    According to Agent Brown, Johnson admitted to having used methamphetamine earlier in

7    the day and consented to a search of the RV.  While agents secured the perimeter of the

8    parking area, Agent Brown and another agent searched the RV.  They discovered drug

9    paraphernalia and an empty gun shell.  Brown then notified the agents outside the RV that

10   ammunition and drug paraphernalia had been discovered, thereby prompting the agents

11   outside the RV to conduct a security sweep around the RV.  During this security sweep, one

12   of the agent's drug-detection dogs alerted to a shed located approximately 43 feet north of

13   the RV on Adams' property.  At the time it alerted, the dog was approximately 5 to 10 yards

14   from the shed.  The agent handling the dog allowed the dog to pull him to the shed; the dog

15   became more animated as it got closer to the shed.  The agents decided to secure the shed and

16   apply for a search warrant.

17       The shed is located approximately 7-8 feet east of and outside of a fence that

18   surrounds Adams' residence.  After agents had secured the shed, Adams came outside his

19   residence and spoke to the agents from behind the fence.  The agents asked Adams if the

20   shed belonged to him, and Adams denied any ownership in the shed, claiming that the shed

21   was not on his property.  Adams then consented to a search of his home.  During the search,

22   agents discovered drug paraphernalia and marijuana, but elected not to arrest Adams or

23   Elliott due to communication problems with the United States Attorney's Office.  Sometime

24   after their home was searched and before the search of the shed, Adams and Elliott left their

25   home to spend the night elsewhere.

26       The agents contacted Agent McGuigan in their Tucson office and asked him to apply

27   for a search warrant for Adams' shed.  The application included the July 8, 2005, tip from

28   Informant 2, the drug dog's alert to the shed, Johnson's admission of drug use, discovery of

drug paraphernalia in the RV, and the 6700 pounds of marijuana discovered on the Piehl property in July.  The application, affidavit and warrant were faxed to Judge Velasco just before midnight.  The warrant was approved telephonically by Judge Velasco around midnight.  On its face, the warrant authorized seizure of property described in "Attachment A which is attached and incorporated by reference."  Attachment A identified 14 categories of items to be seized, including drugs and drug paraphernalia.

Agent McGuigan telephoned Agent Brown to inform him that the search warrant for the shed had been approved and described the items that the agents had authority to seize pursuant to the warrant.  Agent Brown initiated search of the shed just after midnight.  The agents discovered 2181.5 kilograms of marijuana in an underground bunker accessed through a trap door in the shed floor.  The search concluded at approximately 4:00 a.m.  While the search was proceeding, Agent McGuigan traveled to Arivaca with a copy of the search warrant.  Agent Brown testified that he left a copy of the warrant and the return on the floor of the shed.  Agent Brown could not remember whether Attachment A was attached to the copy of the warrant that he left in the shed, but he testified that any failure to attach Attachment A was inadvertent on his part. Robert Johnson, a landscaper hired by Adams and Elliot, and Roberta Elliott both testified that Attachment A was not left in the shed with the warrant and the return.

## ANALYSIS

Adams' motion seeks to suppress evidence obtained as a result of the search of the shed for three reasons:  (1) the agents intruded on the curtilage of Adams' residence in order to make observations regarding the shed, which constituted an illegal search; (2) the application for the search warrant omitted critical contradictory information about the observations of the confidential informant and his criminal history; and (3) the search warrant was defective because it incorporated Attachment A by reference, but Attachment A was not attached to the copy of the warrant that was left at the shed.  The United States disputes Adams' arguments and contends that all three arguments raised by Adams can be rejected

1    outright because Adams' denial of ownership of or interest in the shed constituted

2    abandonment of any possible expectation of privacy he may have possessed.

3        The Court concludes that Adams did abandon his interest in the shed, and therefore

4    had no protected Fourth Amendment interest therein. However, the Court also finds that

5    even if Adams had not abandoned his interest in the shed, the search of the shed would have

6    been lawful.

7    **1.    Adams' statement to agents that the shed did not belong to him and his conduct
            following his interview with police constituted an abandonment of his
8           expectation of privacy in the shed.**

9        Warrantless searches of abandoned property do not violate the Fourth Amendment.

10   *See Abel v. United States*, 362 U.S. 217, 241 (1960). While Adams bears the burden of

11   proving a legitimate expectation of privacy in the shed, *see Rawlings v. Kentucky*, 448 U.S.

12   98, 104 (1980), the burden of proving abandonment is on the government. *See United States*

13   *v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994); *see also United States v. Gonzalez-Mendoza*,

14   985 F.2d 1014, 1017 (9th Cir. 1993) (stating that government always has the burden of

15   proving abandonment of a known right). In order to establish that Adams abandoned his

16   interest in the shed, the government must demonstrate that Adams so relinquished his interest

17   in the shed that he no longer retained a reasonable expectation of privacy at the time of the

18   search. *See United States v. Nordling*, 804 F. 2d 1466, 1469 (9th Cir. 1986). Abandonment

19   is a question of intent. *Id*. The Court's inquiry is focused on the words, acts and objective

20   indications of the defendant. *Id*. This determination is to be made in light of the totality of

21   circumstances, and two important factors are denial of ownership and physical

22   relinquishment of the property. *Id*.

23       The United States has met its burden of proof on its claim of abandonment. Agent

24   Brown testified that when asked about ownership of the shed, Adams stated that he owned

25   his residence and the RV, but that he knew nothing about the shed and that the shed was not

26   on his property. After his home was searched, Adams left his property knowing that agents

27   were attempting to secure a warrant to search the shed. Thus, Adams both denied ownership

28   in the shed and physically relinquished the shed. Other evidence further illustrates that

1    Adams had abandoned any reasonable expectation of privacy in the shed: the shed was not

2    located on the curtilage of his property, but was in an open field outside of the fence that

3    surrounded Adams' home.  The shed was also empty and was not being used or maintained

4    by Adams.  Adams had not taken any measures to protect the shed from observation.

5         Adams argues that his denial of ownership should not be deemed abandonment

6    because he knew the shed was the subject of a police investigation at the time he denied

7    ownership, and he was merely trying to avoid incriminating himself.  Agent Brown admitted

8    that at the time Adams was questioned about the shed, it had already been secured by agents

9    and Adams knew that the agents had an investigative interest in the shed.  Adams testified

10   that he denied ownership of the shed because he did not want to get in trouble.  The fact that

11   Adams knew that agents had secured the shed, however, does not change the character of

12   Adams' abandonment of his interest.  *See United States v. Veatch*, 674 F.2d 1217, 1221 n.5

13   (9th Cir. 1981) (stating that "police pursuit or the existence of a police investigation does not

14   of itself render abandonment involuntary") (citing *United States v. Colbert*, 474 F.2d 174,

15   176 (5th Cir. 1973)).  Adams also argues that he had a reasonable expectation of privacy in

16   the shed, despite his denial of ownership, because the shed was located on his property.

17   Abandonment for purposes of Fourth Amendment analysis, however, is not meant in the

18   strict property-right sense.  *See United States v. Jackson,* 544 F.2d 407, 409 (9th Cir. 1976).

19        The cases cited by Adams in support of his argument are distinguishable from the

20   present case because they involve alleged abandonment of a residence, not an outlying shed.

21   *See United States v. Vegas*, 221 F.3d 789, 796-97 (5th Cir. 2000) (holding that defendant had

22   a reasonable expectation of privacy in his residence because he occupied it and took

23   measures to maintain the privacy of his home by enclosing it within a fence and barring the

24   windows, and that his denied of ownership did not constitute abandonment); *United States*

25   *v. Brown*, 64 F.3d 1083 (7th Cir. 1995) (holding that "everyone has a legitimate expectation

26   of privacy *in his residence*") (emphasis added).  As noted above, the shed was physically

27   separated from Adams' residence by a fence at the time he denied ownership of the shed and

28   physically relinquished the shed.  The shed was not located on the curtilage of the property,

which Adams and Elliot rented.  It was empty and not being used.  Because Adams abandoned his interest in the shed, he has no standing to object to the agents' search or the legality of the search warrant.

**2.     The agents did not intrude on the curtilage of Adams' residence in order to make observations regarding the shed**

Even if Adams had not abandoned his interest in the shed, his argument that the shed was located on the curtilage of his home, and that therefore the government's observations of the shed were an illegal, warrantless search, would be without merit. The agents were on open fields when the dog alerted to the shed.

The open fields surrounding a person's home are not protected from warrantless search under the Fourth Amendment.  *See United States v. Barajas-Avalos*, 377 F3d 1040, 1056 (9th Cir. 2004) (citing *Hester v. United States*, 265 U.S. 57 (1924)).  An individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home, defined as the "curtilage." *Id.* at 1057.  Curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (citations omitted).  Curtilage falls within the umbrella of Fourth Amendment protection. *Id.*(citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).  Four factors are used to determine whether the shed was part of Adams' curtilage:  (1) the proximity of the shed to the home; (2) whether the shed was included within an enclosure surrounding the home; (3) the nature of the uses to which the shed was put; and (4) the steps taken by Adams to protect the shed from observation by people passing by.  *See United States v. Dunn*, 480 U.S. 294, 301 (1987).

Applying these factors, this Court concludes that the shed was not a part of the curtilage of Adams' home.  The shed was located more than 25 yards from Adams' home, outside the home's fence.[2]  Neither Adams nor Elliott used the shed.  Elliott testified that the

---

[2] Defendant argued at the hearing that the shed was part of the curtilage of his home because his entire seven acre parcel was surrounded by a fence.  The fence surrounding the entire parcel, however, is not indicative of an intent by Adams to protect his home from

shed had been built for storage, but that she and Adams had stopped using it after their landlord built a well pump-house closer to their home which afforded more convenient storage space. Adams employed Johnson to maintain the landscaping at the Adams' residence; Johnson's duties included caring for the plants and the residence but he was never asked to care for the shed. In addition, Adams did not take any steps to protect the shed from observation – the shed was located adjacent to the open parking area east of Adams' home. Accordingly, Adams' challenge to the search warrant on this ground fails.

**3.      The search warrant was not based on contradictory information contained in the application**

Even if Adams had not abandoned his interest in the shed, he would not prevail on his argument that the warrant was invalid due to misrepresentations in the application. Adams alleges that the application contained two omissions/ misrepresentations: (1) the warrant failed to mention that the informant who told agents about Adams' shed had previously denied knowing anything about the ownership of the shed or the property, and (2) the warrant mentioned that the informant was incarcerated for a drug offense, but failed to mention that the informant had three felony prosecutions pending in Mojave County, had been to prison at least three times, had previously provided information to law enforcement officers, and had been treated for a mental condition.

Through the parties' filing and at the evidentiary hearing, it was clarified that the Informant who provided information for the search warrant of the Adams' property was a different informant than the informant who provided information for the Piehl warrant. Agent Brown testified that the search of the Piehl property was based on a tip from Informant 1, not Informant 2. Thus it appears that the additional information that Adams believed

_____

observation by people passing by or otherwise delineate the area in which the intimate activity associated with his home occurred. Elliott testified that the perimeter fence might be falling down in some places. There was also no evidence that Adams used the seven acres on a regular basis: although Adams and Elliott maintained landscaping within their fenced yard, little of the seven acres beyond the fence surrounding their home appeared cared for or used, other than as storage for junk vehicles.

should have been included in the warrant was information regarding a different informant, not Informant 2, and therefore the warrant did not exclude contradictory information or omit relevant criminal history regarding Informant 2. In addition, a warrant is only invalid if the probable cause for its issuance is based on an intentional or reckless falsehood. *See Franks v. Delaware*, 438 US 154, 155-56 (1978). Based on the above clarification, there was no evidence suggesting that Agent McGuigan intentionally or recklessly excluded information from his warrant application.

**4.      Even if Adams had not abandoned his interest in the shed, the search of the shed would have been legal because the warrant was not Constitutionally deficient**

A federal search and seizure warrant must comply with both the Fourth Amendment and Fed. R. Crim. P. 41. The Fourth Amendment and Rule 41 require that a search warrant describe with particularity the items to be seized. *See* U.S. Const. Amend. IV; Fed.R.Crim.P. 41(f); *see also United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). A search warrant may be construed with reference to an attachment for purposes of satisfying the particularity requirement if (1) the attachment accompanies the warrant and (2) the warrant uses suitable words of reference which incorporate the affidavit therein. *See United States v. McGrew*, 122 F.3d 847, 849 (9th Cir. 1997) (citations omitted). A search warrant which does not specify the particular items to be seized either on the face of the warrant or by reference and incorporation of an attached list is Constitutionally defective. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). In fact, in *Groh*, the Supreme Court held that a search warrant was "plainly invalid" because of such a failure, even though the application in support of the warrant listed the particular items to be seized. According to the Court, although the application for the warrant described the things to be seized, the Fourth Amendment requires that the warrant itself particularly describe those items. 540 U.S. at 557.

Adams argues that the search warrant was defective because Attachment A was not attached to, nor served with the warrant at the time of its execution. (Motion at 15.) The evidence presented during the evidentiary hearing showed that Judge Velasco was provided with a copy of Attachment A at the time that he authorized the warrant, but that the copy of

the warrant left at the shed did not include Attachment A.  It was clear that the search commenced before the warrant was brought to the scene.  Agent Brown testified that the search commenced prior to Agent McGuigan arriving in Arivaca with the warrant, and that the scope of the search was defined by Agent McGuigan's telephonic instructions regarding the items authorized to be seized.  The record is devoid of any evidence, however, demonstrating whether Attachment A accompanied the warrant to the scene or whether it was affixed to the warrant at the time of the search.

Ninth Circuit case law supports the Defendant's argument.  The Ninth Circuit has held that when a search warrant references and incorporates an affidavit to specify the items to be seized, the affidavit must accompany the warrant at the time of the execution of the search.  *See United States v. Hotal,* 143 F.3d 1223, 1225-26 (9th Cir. 1998) (absent evidence that affidavit accompanied or was attached to the warrant at the time the warrant was executed, the fact that the warrant states that the affidavit is attached and incorporated is insufficient to satisfy particularity requirement of Fourth Amendment); *United States v. McGrew,* 122 F.3d 847, 849-50 (9th Cir.1997) (dismissing argument that so long as agents are aware of the contents of the affidavit listing the items they may seize, the Fourth Amendment's particularity requirement is satisfied; government must produce evidence that affidavit accompanied warrant at time of search); *United States v. Van Damme,* 48 F.3d 461, 465-66 (9th Cir.1995) (holding warrant that referenced attachment listing items to be seized was insufficient when government presented no evidence that attachment accompanied warrant at time of search); *cf. United States v. Towne,* 997 F.2d 537, 544 (9th Cir.1993) (remanding for determination of whether to consider attachment where government offered declaration stating that attachment had accompanied warrant).  The Ninth Circuit  has reasoned that requiring that law enforcement officers serve the warrant and attachments specifying the items to be seized at the time of the execution of the warrant  serves two aims: "to limit the officer's discretion and to inform the person subject to the search what items the officers executing the warrant can seize." *McGrew,* 122 F.3d at 850 (citing *United States v.*

1   *Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986) and *Center Art Galleries-Hawaii, Inc. v. United*

2   *States*, 875 F.2d 747, 750 (9th Cir. 1989)).

3          Two recent decisions by the Supreme Court, however, call into question the Ninth

4   Circuit's requirement that attachments be served with the warrant prior to initiation of a

5   search.  As noted above, in *Groh v. Ramirez*, 540 U.S. 551, 561(2004), the Supreme Court

6   held that a warrant is plainly invalid if it does not list on its face the items to be seized or

7   incorporate by reference a list of the items to be seized.  540 U.S. at 557.  In reaching this

8   conclusion, the Court recognized that the purpose of the particularity requirement is to assure

9   the individual whose property is searched or seized of the lawful authority of the executing

10  officer, his need to search, and the limits of his power to search.  Nonetheless, the Court also

11  stated that neither the Fourth Amendment nor Rule 41, Fed.R.Crim.P, require an officer

12  executing a search warrant to serve the warrant on the owner before commencing the search.

13  540 U.S. at 561-62, nt. 5.[3]

14         In the subsequent case of *United States v. Grubbs*, 126 S.Ct. 1494 (2006), the Court

15  reversed the Ninth Circuit's ruling that an anticipatory search warrant was invalid because

16  the warrant did not specify the triggering condition.  126 S.Ct. at 1500-01.  The Court held

17  that the listing of the triggering condition in the warrant was not required by the Fourth

18  Amendment and was not necessary to assure the individual whose property is searched or

19  seized of the lawful authority of the executing officer, his need to search, and the limits of

20  his power to search, as the Ninth Circuit had reasoned.  The Supreme Court again stated

21  neither the Fourth Amendment nor Rule 41, Fed.R.Crim.P, require that an executing officer

22  present the property owner with a copy of the warrant before conducting his search.  126

23  S.Ct. at 1501.  According to the Court,  the Fourth Amendment protects property owners by

24  _____

25         [3] The Court explained that it was not deciding whether it would be unreasonable for
    an officer to refuse a request to furnish the warrant at the outset of the search when the
26  occupant of the premises is present and poses no threat to the officers' execution of the
    warrant.  580 U.S. 562, nt. 5.  In the present case, this particular concern is not implicated
27  because Adams was not present at the time of the search and did not request that officers
    furnish the warrant.  Moreover, he disavowed interest in the shed.
28

1   interposing the deliberate, impartial judgment of a judicial officer between the citizen and

2   the police, not by giving property owners license to engage the police in a debate over the

3   basis for the warrant. *Id.* (citations omitted).[4]

4        In this case, Adams received the protections afforded to him by the Fourth

5   Amendment when Judge Velasco exercised his impartial judgment and authorized the search

6   warrant and the seizure of the items listed in Attachment A.  The Court's records show that

7   Attachment A was presented to Judge Velasco at the time that Judge Velasco authorized the

8   telephonic warrant and that Attachment A is part of the warrant in the Court's files.  The fact

9   that Attachment A was not left at the shed with the warrant or presented to the property

10  owner (who was unknown or not present) at the onset of the search does not amount to a

11  Constitutional defect requiring invalidation of the search.

12       The agents did violate Rule 41(f)(3), Federal Rules of Criminal Procedure, which

13  requires "the officer executing the warrant" to:  "(A) give a copy of the warrant and a receipt

14  for the property taken to the person from whom, or from whose premises, the property was

15  taken; or (B) leave a copy of the warrant and receipt at the place where the officer took the

16  property."  But the government correctly notes that a violation of Rule 41 is rarely the proper

17  remedy for suppression.  *United States v. Calandra*, 414 U.S. 338, 348 n. 6 (1974).

18

19       [4] After Groh, the Ninth Circuit acknowledged the Supreme Court's conclusion that

20  service of a warrant was not required prior to initiation of the search; nonetheless, the Ninth
    Circuit concluded that "while [dictum] in . . . *Groh v. Ramirez* casts serious doubt on our

21  interpretation of Rule 41 and our reasoning . . ., it fails definitively to abrogate our holding."

22  *United States v . Williamson*, 439 F.3d 1125, 1132 (9ᵗʰ Cir. 2006). Consequently, in
    *Williamson* the court concluded that the failure of agents executing a warrant to give the

23  defendant a copy of the warrant before searching his home violated (an earlier version) of
    Rule 41(f)(3), Fed.R.Crim.Pro.

24       Even if *Groh* did not completely abrogate the Ninth Circuit's prior holdings, this Court

25  still concludes that the warrant in this case was not invalid merely because the government
    failed to present evidence that a complete copy of the warrant was at the scene at the

26  initiation of the search.  There is no question that a valid search warrant was authorized by
    the Court.  In this instance, agents could not have and would not have presented Defendant

27  Adams with the search warrant before the search commenced because Adams had denied

28  ownership of the shed and had left the premises.

Defendant has not alleged any prejudice resulting from the agent's failure to leave Attachment A with the warrant left in the shed.  Moreover, given the particular facts of this case - that Adams denied any interest in the shed and was not present at the time the search was undertaken - the failure to leave Attachment A was a defect which could be and was remedied by providing a copy of the Attachment to Adams after charges were initiated.

**RECOMMENDATIONS**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendant Adams' Motion to Suppress (Doc. No. 37).  The parties have **ten (10) days** to serve and file written objections to the Report and Recommendation.  The parties are advised that any objections should be filed with the following caption:  **CR-05-1794-TUC-RCC**.

**DATED** this 18th day of January, 2007.

_____
Jennifer C. Guerin
United States Magistrate Judge